**Affirmed and Memorandum Opinion filed March 26, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00924-CV

---

## IN THE INTEREST OF C.D.F., A CHILD

---

### On Appeal from the 315th District Court
### Harris County
### Trial Court Cause No. 2011-01584J

---

## M E M O R A N D U M     O P I N I O N

Appellant Alicia Davis appeals the trial court's order terminating her parental rights to her son, C.D.F. In three issues, Davis challenges the sufficiency of the evidence underlying the findings in the termination order. We affirm.

I

C.D.F. was born on September 26, 2006, at 23 weeks gestation. As a result of his extremely premature birth, he suffers from lung and eye diseases, and, for the first several years of his life, he required a tracheostomy tube to help him

breathe and a gastrostomy tube to help him eat. C.D.F.'s primary-care physician, Dr. Carl Tapia, has been treating C.D.F. since December of 2007, and he coordinates C.D.F's visits with specialist physicians who help manage C.D.F.'s special medical needs. In early 2011, Dr. Tapia learned C.D.F. had missed several appointments with his specialists. This was dangerous because the doctors could not monitor changes in C.D.F.'s medical status or ensure he continued to receive the proper care.

A referral was made to Children's Protective Services (CPS), and CPS requested documentation from Dr. Tapia about C.D.F.'s medical care. Dr. Tapia determined C.D.F. had missed fifteen appointments with his specialists in the previous 12 to 14 months. In March of 2011, the Texas Department of Family Protective Services removed C.D.F. from Davis's custody. The trial court appointed the department as C.D.F.'s temporary managing conservator, and he was placed with his paternal grandmother until she died in September of 2011. C.D.F. was then placed in a foster home and has remained there ever since. After a trial on August 29, 2012, the trial court issued an order permanently terminating Davis's parental rights to C.D.F. based on subsections (D), (E), and (O) of Texas Family Code section 161.001(1). The trial court also held the termination was in C.D.F.'s best interest.[1]

On appeal, Davis argues the evidence is factually insufficient to support termination under subsection (E), legally and factually insufficient to support termination under subsections (D) and (O), and legally and factually insufficient to support the trial court's finding that termination of the parent–child relationship is in C.D.F.'s best interest.

---

[1] C.D.F.'s biological father was incarcerated when the department took custody of C.D.F. The trial court's order also terminated his parental rights to C.D.F., but he does not appeal.

## II

In Texas, to terminate the parent–child relationship, a trial court must find by clear and convincing evidence that (1) the parent committed one or more of the acts specifically named in section 161.001(1) of the Texas Family Code as grounds for termination, and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001; *In re U.P.*, 105 S.W.3d 222, 229 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002).

When reviewing legal-sufficiency challenges to termination findings, we consider all the evidence in the light most favorable to the findings to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the findings are true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). If, after conducting our review of the record evidence, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we conclude the evidence is legally insufficient. *Id.*

In reviewing factual-sufficiency challenges to termination findings, we give due consideration to evidence that the factfinder could reasonably have found clear and convincing. *Id.*; *In re C.H.*, 89 S.W.3d at 25–26. Our inquiry is whether the evidence is such that a factfinder reasonably could form a firm belief or conviction about the truth of the department's allegations. *In re J.F.C.*, 96 S.W.3d at 266. We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact findings, and we do not supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

III

In her first issue, Davis challenges the factual sufficiency of the evidence supporting termination of her parental rights under section 161.001(1)(E). She does not challenge the legal sufficiency of the evidence supporting this finding.

Under section 161.001(1)(E), the trial court may terminate the parent–child relationship if the court finds clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code § 161.001(1)(E). The term "endanger" means to expose the child to loss or injury or to jeopardize the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangering conduct need not be directed at or cause actual injury to the child. *In re U.P.*, 105 S.W.3d at 233. Termination under this subsection must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In this case, the evidence shows C.D.F. is a medically fragile child as a result of his extremely premature birth, and a number of specialists treat C.D.F. to manage his special medical needs: A pulmonary specialist monitors his lung disease, which could worsen as C.D.F. grows; an eye specialist monitors C.D.F.'s eye disease, which could result in blindness; and an ear, nose, and throat (ENT) specialist manages C.D.F.'s breathing tube. The evidence shows C.D.F. missed between six and 15 appointments with his specialists in the 12-to-14 month period

4

before the department removed him from Davis's custody.

At trial, Dr. Tapia explained that as children grow, the dynamics of their lungs and throats change, as does the medical support they need.[2] When children with breathing tubes sleep, there is a risk that their throats may close down and they may not get enough oxygen. If the child does not receive the proper support and this problem persists over time, it can put pressure on the child's heart and lead to heart disease, heart failure, and even death, although the more common consequence is developmental delays. Accordingly, C.D.F.'s ENT specialist needed to do additional studies to determine whether C.D.F. was breathing properly, especially while he slept. Dr. Tapia testified that not going to the appointments endangered C.D.F. because his doctors were unaware of how he was breathing and unable to ensure he continued to receive the proper care as his medical needs changed.

Davis testified, "From what I was told, it was six [missed appointments]. Not 15." She explained that C.D.F. had a nurse, and it was the nurse's responsibility to schedule and take C.D.F. to his medical appointments. Davis has a seizure disorder that prevents her from driving, but she accompanied C.D.F. and his nurse to at least 50 appointments before he was removed from her custody. Davis testified that she expressed her concern to C.D.F.'s nurse every time he missed an appointment.

We conclude a reasonable factfinder could form a firm belief or conviction in the department's allegations because (1) Davis failed to ensure that C.D.F. attended his medical appointments; (2) she knowingly placed him with a nurse who was not taking him to his medical appointments; and (3) missing those

---

[2] Dr. Tapia testified both as C.D.F.'s primary-care physician and as an expert in children's medical complexity.

5

appointments jeopardized C.D.F.'s physical well-being. The fact that no injury to C.D.F. can be directly attributed to Davis's conduct is irrelevant. *See In re U.P.*, 105 S.W.3d at 233 ("Endangering acts need not . . . cause actual injury or threat of injury to the child."). Therefore, the evidence is factually sufficient to support termination under subsection (E). Because Davis's parental rights can be terminated with a finding of C.D.F.'s best interest and any one of the grounds from section 161.001(1), we need not address Davis's challenges to the findings based on subsections (D) or (O).

IV

In her third issue, Davis argues the evidence is legally and factually insufficient to satisfy the requirement that clear and convincing evidence supports the finding that termination of the parent–child relationship is in C.D.F.'s best interest. *See* Tex. Fam. Code § 161.001(2).

There is a strong presumption that the best interest of a child is served by keeping him with his natural parent. Tex. Fam. Code §§ 153.131(b), 153.191, 153.252; *In re U.P.*, 105 S.W.3d at 230. To rebut this presumption, there must be clear and convincing evidence of the natural parent's present unfitness. *In re U.P.*, 105 S.W.3d at 230. The Texas Supreme Court has examined a number of factors in ascertaining the best interest of the child, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the person seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts

6

or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, nor is evidence required on all nine factors for the court's finding. *In re U.P.*, 105 S.W.3d at 230. Courts of appeals should not rely on a lack of evidence to contradict a finding as if it were evidence supporting the finding. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

There is little evidence in the record indicating C.D.F.'s desires. Davis testified he seems happy to see her when she visits, but she visited him only four times in the eleven months before trial, despite having the opportunity to visit him twice a month. Kristina Moore, C.D.F.'s caseworker at the department, testified the minimal contact between Davis and C.D.F. raised concerns that Davis was not aware of C.D.F.'s current needs and that the bond between them may not be intact. Moore was also concerned that Davis had not made an effort to see C.D.F.[3]

The evidence also shows that when C.D.F. was first removed from Davis's care, he had behavioral problems, he was not meeting developmental milestones, and he had skin granulation, or skin breakdown, on his face around the site of his feeding tube. Dr. Tapia explained that skin granulation causes pain and bleeding, and usually indicates the site was not being maintained well or cleaned properly. Additionally, C.D.F. was not gaining weight well, and reports from workers in his home indicated concern that he was not getting his formula. Dr. Tapia testified that although inadequate caloric intake can limit growth, he could not rule out other potential causes because C.D.F. had not had a recent medical examination.

After C.D.F. was taken into the department's custody, his health markedly improved. He began growing and developing at a much faster rate, which indicates

---

[3]Moore testified that Davis scheduled five additional visits but subsequently canceled them. At trial, Davis testified, "A couple of visits I was not aware of, and I let [Moore] know that." But she also testified that she understood it was her responsibility to contact Moore to schedule visits and that she did so on several occasions.

he was getting more consistent care. By the time of trial, C.D.F. was meeting his developmental milestones in a timely manner, he no longer required a breathing tube, he was learning to eat on his own, and he no longer had behavioral problems. He was also participating in occupational, speech, and physical therapies. Although his foster mother believes she is too old to permanently adopt C.D.F., Moore believes the department can find him an adoptive family. She also explained that the department was in the process of determining whether C.D.F.'s maternal grandmother is a potential candidate to adopt him.

C.D.F. currently maintains a vigorous schedule, and consistency is important for his continued progress. Dr. Tapia explained that at C.D.F.'s age, he will quickly lose the milestones he has achieved unless he consistently adheres to his therapy plan. Although Dr. Tapia believes Davis is capable of learning how to care for C.D.F., the record contains substantial evidence suggesting that Davis will not provide consistent care for C.D.F. For example, although the trial court instructed Davis to attend all of C.D.F.'s medical appointments while he was in the department's custody, she did not attend a single one. The trial court also instructed her to participate in individual therapy, a drug-assessment program, and drug testing. Davis missed three appointments for individual therapy before ultimately completing it. She failed drug tests in March 2011, December 2011, and June 2012, each time testing positive for cocaine, and she missed her drug-test appointments in June 2011 and March 2012. She also missed three appointments for her substance-abuse program and had to reschedule three others, but she finished the program the day before trial. Davis testified that she had never used drugs, but when asked whether she could pass a drug test on the day of trial, she said a urinalysis would be negative but she could not say a hair-follicle test would be.

Davis consistently attributed her absences to a lack of transportation. When Moore suggested Davis ride the bus, Davis said she did not know how. At trial, Davis insisted she could provide consistent transportation for C.D.F. to get to his medical appointments because he had Medicaid, which would cover his transportation, and Davis's 20-year-old daughter would also help. Davis said her "support system" was C.D.F.'s cousin who had been driving Davis around since August 2011 and who was willing to help take C.D.F. to his medical appointments. Nevertheless, Davis continued to miss appointments after August 2011, and she explained that the cousin was only available if Davis could pay her $50 to $60, which Davis could not always do.

Having weighed all the evidence, we conclude there is legally and factually sufficient clear and convincing evidence to support the trial court's finding that termination of the parent–child relationship between Davis and C.D.F. is in C.D.F.'s best interest. We therefore overrule Davis's third point of error.

* * *

Accordingly, we conclude the evidence is legally and factually sufficient to support the trial court's order terminating Davis's parental rights to C.D.F. The trial court's judgment is affirmed.


/s/    Jeffrey V. Brown
       Justice



Panel consists of Justices Frost, Brown, and Busby.

9